Our last case for argument is 21-2101, In Re Intelligent Packaging. Mr. Cox, please proceed. At police report, my name is Don Cox, counsel. I represent Intelligent Packaging, and this is a very straightforward case. In our view, Intelligent was the first entity to develop a process for packaging a non-pasteurized wine in a two-piece aluminum can, comprising the process of Independent Claim 17-2225 and 30. In fact, Intelligent has patents in virtually every major country in the world. It has patents in over 13 countries. It has at least 18 licenses. This is a well-received, well-recognized process that is used all over the world by our clients. The primary reference relied on by the patent office is, and I don't know how to get these names wrong, my pronunciation of Italian is horrible, but it's Ferranini, and that's the base reference. And then that is combined with Rubio-Gallant, said to result in the obviousness of an aluminum can product, which does not have pasteurization. And those two references cannot be added up to arrive at that process. If you look at Figure 7 of the primary reference, Ferranini, it does specifically— Counsel, I've read your briefs and I understand what you're saying, but what about the fact that, and I'm going to say this incorrectly as you, what about the fact that Ribero-Gallant, Volume 2, talks about using techniques other than pasteurization in order to stabilize the wine. Isn't that a direct teaching of not using pasteurization? Why did the PTO err in relying on that disclosure? Well, the statement says the wine has not been— I'm sorry, it states other stabilization techniques, especially sulfuring and sterile filtration. None of those are non-pasteurization. And then it goes on to say prior to bottling, bottling are easier to use. Now, why would you use bottling technology, which bottling doesn't have the same problems that aluminum does? So this isn't even in the same area of the art. Second— I want to interrupt you for a minute. You said the phrase especially sulfuring and sterile filtration prior to bottling. You say that's pasteurization. What evidence do you have of that? No, I don't say that's pasteurization. That's something entirely different. Sulfuring and sterile filtration. What I say is that if you go through Rubio-Gallant, Volume 2, there are numerous references to pasteurization. So this one little sentence out of all the— there are eight or nine different references to pasteurization. This one sentence, which doesn't say don't use pasteurization, it talks about other products, and it talks about bottling. So I don't see how you can take a reference that says pasteurize and combine it with something which is silent. It doesn't say don't pasteurize. So I don't see how, if you look at the John Deere and the other cases, how this adds up to do not use pasteurization. That's my interpretation of Rubio-Gallant. And when you read the whole of the reference and all the references to pasteurization in the reference, I don't see how you get to this saying don't use pasteurization. It doesn't say one way or the other in this one sentence. So I don't think that gets us there. And then when we get to the secondary considerations, I mean, they're monumental. The number of patent licenses that we have, the number of patents that we have. I want to ask you about that, the secondary considerations and specifically the licenses. When I looked at that evidence, one concern I had was about nexus, and specifically the claim that you identified as being the basis for the license and I suppose the claim that is supposed to be similar to the claim at issue here doesn't have the pasteurization limitation that you're focusing on here as being the reason for distinguishing the no pasteurization limitation, I should say. So how is there a nexus? Well, I don't think there has to be perfect correspondence between the two. There's the Fox case about that. But one of the similarities is that the European patents and the foreign patents are all broader than the patent we're seeking here in the U.S. I understand, but there are some cases that we have that talk about secondary considerations can't be directed to things that are just in the prior art. So I'm not sure that the claim is broader is really helpful to you, and I do think that this no pasteurization limitation matters in terms of showing nexus. So do you have anything else? Well, there are a number of other secondary considerations in addition to sales of our product, commercial success, a claim and recognition by others, long felt but unresolved need. Why would people take all these licenses? Why would they go to the trouble of giving us awards if this weren't a successful invention? So the idea that we are seeking a patent on a narrower work invention doesn't mean that we can't look to the impact that our European sales had on the market. I do not believe, as I said before, you don't have to have an absolute overlap in terms of what the product is that provides for secondary considerations. One of the arguments raised here was there was no proof of significant license fees being paid. Well, we went out and got 13 European patents, and if anybody has dealt with foreign patent prosecution, you know that's tens and tens of thousands of dollars. Why would we spend all that money to get European patents and then only get a farthing in return as the patent office argued? The final argument they made was that the licenses didn't deal with the invented concept, but the licenses, if you read through what's in the record, they show that these are licenses on EP1429968, which is the parent, if you will, of the U.S. application. So these are all of a part, and we believe that, first off, the references that were combined were inappropriately combined, and second, there are numerous examples of— Well, you have to look at the claim as a whole, not just one part, but certainly there is an extreme importance in non-pasteurization. That's—and nobody else has done it. Look for the phrase non-pasteurization in any of the references in the record, and it's not found. And did you link the licenses or your commercial success to that non-pasteurization? I linked the overall invention, which includes non-pasteurization, because the foreign claims would read on something that's non-pasteurized. So that's why it's important that the foreign claims are broad, because they read on the non-pasteurization, which is the factor we're primarily arguing about today. But if the key component of this invention that helps withstand an obvious mischallenge is the non-pasteurization, then the non-pasteurization has to be a significant factor in the secondary considerations. You have to be able to show that the licenses or the commercial success was due in part, at least, to that non-pasteurization, because that's what really distinguishes your claims from the prior art. So the problem is I just see sort of broad assertions that we have licenses, and I don't see any linkage, which is what we call the nexus, between those licenses and these claims, and in particular what allowed you to get these claims, arguably. Well, let me first start with the, you know, you don't, in my view, of patent law, pick out one part of a claim and have your invention or the secondary considerations rise and fall on that single point. Yes, but if you're selling something, if you have commercial success or a license, and the thing that you're selling is exactly what was available in the prior art, then you can't argue that that is, in fact, what gives you the non-obviousness arguments for your claims. You have to be able to demonstrate that the thing that drove the sales, the thing that people licensed, the thing that mattered, was the thing that does, in fact, distinguish your invention from the prior art, not something fully contained within the prior art. Well, it's not fully contained in the prior art. There's no place in the prior art where non-pasteurization is disclosed, and I guess we have to just disagree on that, but neither of the combined references show that, so the idea that we are using something in the prior art is not supported by the record. Okay, counsel, why don't we hear from counsel for the government, and then we'll restore some rebuttal time for you. Thank you. Thank you. Good morning, Your Honor. Please support. I'd like to address two things that my friend has said. First is he has said that the prior art does not disclose the use of techniques other than pasteurization, but, in fact, Griswold Volume 2, which is a treatise on etiology, it says there are other techniques and that these other techniques are easier to use than pasteurization. And this is specifically, counsel, you're relying on page A3040 of Volume 2. Is that right? I mean, I'm sorry. It's appendix page 3040, Volume 2 of the treatise. Is that right? I'm looking at appendix 3049, and it's just in the left-hand column before the heading 12.2.4. And it says, of course, wine may be pasteurized in the bottle or just before bottling, but other stabilization techniques, especially sulfuring and sterile filtration prior bottling, are easier to use. So there are Rimuro Gayon, which is a textbook on etiology, is teaching us that there are other techniques known in the art to stabilize wine, and that these other techniques, though admittedly less popular than pasteurization, are, in fact, easier to use. And something that's easier to use, that is certainly a statement in the prior art that something's easier to use, should fulfill this court's requirements for a motivation to combine. And the second thing that I would like to respond to is part of the invention idea that Judge Moore and Judge Stoll were discussing with my friend. What happened here below, and this is the reason why pasteurization, or the lack of pasteurization is so important, is claims very similar, nearly identical, to those in intelligence European patents and these other foreign patents that had no requirement as to pasteurization were rejected by the examiner over Ferrarini and Cotta and Kojima. And those claims went up to the board, and the rejection was affirmed by the board. And rather than seeking those claims, to patent those claims to challenge that rejection before this court, what intelligence did was it reopened prosecution and it amended claims 17, 22, and 30 to include the unpasteurized limitation, and it amended claim 25 to include the headspace gas mix. Now, what that says to, I think, any observer is that intelligence believes that its patentability lies in the fact that its process involves the canning of unpasteurized wine and that, in fact, it also involves, at least with respect to claim 25, a particular headspace gas mixture. Ms. Kelly? What's this? I agree that one can view this claim change as some sort of disclaimer. Can you hear me? Yes, I can. Okay. As some sort of disclaimer. But we're talking about the patentability of what's left in the United States, not what might arise in some foreign country, depending on what we decide here. So why would that affect the obviousness determination in a straightforward manner looking at the prior art? Well, intelligence appeared to accept the rejection of claims without the no-pasteurization limitation when it did not appeal the board's prior rejection of its claims. That's what they're objecting to on this appeal. No, they didn't appeal that board decision. Instead, they came back, they filed a request for continued examination, added in the amendment about no pasteurization, and then moved forward. And so the heart of the invention, as Judge Moore was characterizing it, is this lack of pasteurization, which is taught by Rebar-O'Brien, too, and which has not been demonstrated by intelligence to be a feature of any of its secondary considerations evidence. None of their license agreements are directed to patent claims where the wine is unpasteurized or where the wine has a specific The burden is on the office, not the applicant. I agree that this is how the argument has evolved, but the burden is entitled to a patent unless. And now that the claims have been significantly narrowed, we need to know why. And although there may be commercial considerations that are included, but we still need to know. Well, with all due respect, Your Honor, under this court's decision that Inouye Wong, in cases like Inouye Rebar, the burden to establish a nexus is initially on the applicant, the person asserting the secondary considerations evidence. Unlike what has been written in appellant's bravery, there's no presumption of nexus. The cases that Mr. Cox cites as support for that argument are all cases from district court litigation. We're talking about a patent application here, not something that carries a presumption of validity. And under cases like Wong and Rebar, the burden of showing a nexus is initially on Mr. Cox, the burden of production, the burden of demonstrating a nexus. Let's say that the nexus doesn't apply and the secondary considerations are diminished in effect. How does this affect the consideration of the obviousness of combining these references? Well, Your Honor, this court has case law stating that when there is a strong... If we're setting aside the whole lack of nexus issue, the office has stated that when there is a strong prime... I'm sorry, this court has stated that when there is a strong case of obviousness, as is here, then it becomes very difficult. A larger amount of secondary considerations evidence is necessary to then push the burden back on the office. And certainly that wasn't done here. If you look to, for example, some of the evidence you have in Declaration by Mr. Stokes, who is one of the owners of Intelligent or the Bar Oaks, Mr. Stokes and Mr. Barracks, their names are combined, I'm assuming, to make the Bar Oaks label. He, as an interested party, he states that he tasted his wines, you know, canned according to the claim process compared to wines produced in cans according to prior art methods. And he tasted, I think, three of them over a period of time. And his personal taste was he didn't like the other wines. They tasted like they were being, to use the term, skunked. That sort of evidence is not the sort of evidence that the court typically accepts as sufficient to shift the burden back to the patent office. We have other testimonies. So where is your prime efficient suggestion of pasteurizing the wine in the aluminum cans? This evidence you just told us about goes in the opposite direction, that the pasteurization, the heating, changes the wine. No, Your Honor, the point of the pasteurization is simply to stabilize the wine. So the yeast that produce the wine don't continue growing and explode the cans, et cetera, et cetera. The prior art teaches a low-corrosion wine in being packaged with an epoxy resin coating that's taught by both Malin and Kana. And it's that epoxy resin coating that prevents the acidic wine from breaking down the aluminum can and skunking the wine. And it's that coating, if anything, that is important to preventing that aluminum corrosion. The thing is, is that Kana teaches, specifically teaches, a coating that prevents other acidic liquids like beer and soft drinks from eroding the aluminum can. And even if you look at the appellant specification, they state that beer and soft drinks have a pH between three and four, and that wine has a pH of three. So that still falls within the same range. And then if you look at Malin, Malin teaches that his epoxy resin is suitable for preventing aluminum corrosion when you have talking about canned things such as beer and soft drinks and tomato juice. So it's reasonable to assume that these prior art epoxy resins that prevent the skunking of the wine, of the aluminum corrosion, with things having a similar pH will also prevent the corrosion of something with the same pH, pasteurized or unpasteurized wine. There's nothing in the record that says that pasteurization or filtering alters the pH of wine in any way. Did Your Honor? Counsel, how does, for the question of secondary consideration, how does, for example, what was being sold in Japan, Korea, China, Canada, how does what was being sold differ from what's being claimed in this case? We don't know. We simply don't know. These wines, for example, if you look at the awards and praise evidence, all it classifies the wine as is as bubbly or not bubbly. That doesn't tell us about the nature of the wine, whether it's a low-corrosion wine, it's required by the claims, whether it's been pasteurized or not pasteurized. It doesn't tell us anything about the head space gas mixture. The same is true for the licensing evidence. And was there nothing introduced that showed the particular wines that got awards corresponded to a particular one and it had these characteristics? No. They never presented any evidence like that. And in fact, if you look to, I believe it's the May Declaration, that actually says that a big part of the reason that these wines in these cans succeeded and performed so well was, she says, one, because of the wine itself, the quality of the wine itself, which is not something that's claimed. And she says, two, the epoxy resin, which coats the inside of the can and prevents the skunking. But again, that's not a feature of Claim 22, 25, and Claim 30. So even their own expert witness points to the primary reasons for the success being something outside of the claims. And this court's case law is very clear that for secondary considerations, evidence for an applicant to succeed on that, they must at least first show that the thing being praised and copied and licensed and showing unexpected results must be the thing that is actually claimed here, not something found in the prior art, as is the case here, not something that you may disclose but not put it right side of your claims, but what you actually claim here. And in this case, intelligence simply has not met that burden. The law in its opinion on the licenses talks about a lack of nexus, but it also says in its opinion something like, for all we know, the reason that they took the license was to avoid litigation. Does the PTO defend that second reason? We agree that that could have been worded better. What I think it was perhaps some additional commentary on the lack of a monetary showing by intelligence and maybe some frustration with that because they talk about having this large market share, et cetera, but yet they provide no financial information to explain. They didn't know the amount of the licenses or anything like that. There was no sales figures for commercial exploitation or anything. And in addition, there was a challenge to access, right? They have one exhibit. I'm sorry for interrupting, Your Honor. I see that my time is... Well, I'm over my time. And so I apologize. But they do have one piece of data showing sales figures and projected sales, but it doesn't contain any units. So you can't discern how many dollars of sales there are or anything like that. And you don't know what's being sold. All it says is VINSAFE technology. And there's not anywhere in the record any explanation of what VINSAFE technology is. Does VINSAFE technology relate to pasteurized wines? Does it relate to unpasteurized wines? You know, a particular headspace gas mixture? We don't know. Okay, thank you. Thank you, Ms. Kelly. Mr. Cox has some rebuttal time. How much time does he have left, Michael? None? Huh? Give him two minutes, please. Claim 30 doesn't require non-pasteurization. But it does require a particular headspace, right? Yes, but it does not require non-pasteurization. With respect to what product is linked to VINSAFE, if you look at the license, it defines the VINSAFE product as the European patent. Opposing counsel cited Milan and Cordova, but those aren't aluminum can wines. Does the European patent have the same headspace limitation as this patent? To be blunt, I don't know. So the problem is, if the license that is in record is keyed to the European patent, and if we have no idea whether the European patent includes the same limitation here, we don't know if what was being sold there falls clearly within these claims, right? That's my concern. In the record, it's the European patent, which we can look at, and it can be determined. There's a claim, claim 9 of the European patent, which talks about the headspace, and there's another claim, claim 7, which says the headspace has a certain amount of nitrogen. Right, but again, you had the obligation to show Nexus in the first instance, and if it's not clear  then we can't tell if it falls within the claims, and therefore we don't know if that evidence is meaningfully linked to whether or not these claims are non-obvious. But the license agreement, which they're paying for, refers directly to the patent, so they wouldn't have a license under any of the claims and sub-claims of the European patent. I want to deal with one of your honors referred to, a straightforward application of obviousness. And if you just take the page, and remember, in Rubio-Gaian, Volume 2, they're relying on a single sentence, on a single page, and it's Appendix 3040. And on that page, I will read, and it said in reverse, Counsel, we know what it says, you don't have to read it. Oh, I was just going to make a point that there are at least half a dozen different references to pasteurization, and the claim, which isn't straightforward at all, that when you say that there are other stabilization techniques, that automatically reads non-pasteurization. And I submit that's not a straightforward application of the obviousness criteria. Okay, I thank you, Mr. Cox. I thank both counsel. This case is taken under submission. Thank you, Your Honor.